## L. C. MONTGOMERY v. STATE.

No. A-10226.   Nov. 18, 1942.

(131 P. 2d 127.)

Sid White, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and J. Walker Field, Asst. Atty. Gen., for defendant in error.

JONES, J.   The defendant, L. C. Montgomery, was charged by information filed in the court of common pleas of Oklahoma county with the crime of resisting an executive officer in the performance of his duty, was tried, convicted, and sentenced to pay a fine of $50 and costs, and has appealed.

That part of the information which describes the acts of the defendant which are alleged to have been committed is as follows: "* * * and in resisting the arrest and service of said warrants, the said L. C. Montgomery, did strike, beat, bruise and otherwise maltreat the said J. R. Turner, all of which acts were done by the said defendant, L. C. Montgomery, in the resistance of the said officer in the performance of his official duties; * * *."

Several assignments of error are presented by the defendant, but his brief is devoted mainly to the proposition that the evidence is wholly insufficient to sustain the conviction.

No brief has been filed on behalf of the state, and at the time the cause was set for oral argument counsel who appeared for the state informed this court that in their opinion the evidence was insufficient to sustain the conviction. However, no formal confession of error has been filed.

The defendant was 50 years of age and engaged in the business of buying and selling used furniture and other secondhand goods in Oklahoma City.

Prior to the occasion in question, the officers of Oklahoma City had made various searches of the place of business operated by the defendant looking for stolen merchandise. On some of these trips they had been successful in finding articles which had been reported to them as stolen. The defendant had complained that the officers were searching his place of business without a search warrant several times daily and were disturbing his business and their activities were preventing him from selling his merchandise.

On the morning of the day the offense was alleged to have been committed, the defendant and his attorney had secured a temporary restraining order from the district court restraining the officers from making a search of the defendant's place of business without a search warrant. About 2 o'clock in the afternoon on that day five of the officers obtained a search warrant and went to the defendant's place of business. The facts up to this point are undisputed.

J. W. Casady, policeman, testified that he was in another part of the building and heard a commotion out

on the sidewalk and that when he got out there he saw Mr. Turner (the policeman) throw defendant over his shoulder onto the sidewalk and that he picked the defendant up and put him in the car. He further testified:

"Q. What did Mr. Montgomery say, if he said anything? A. He was screaming for help. He had people around there working for him and he wanted them to help him. Q. Did you see anybody strike him? A. No, sir, I didn't. Q. And was he the worst beat up man that ever came into the courthouse? A. No, sir. Q. Mr. White here, in his opening statement, said he was the worst beat up man that ever came into the courthouse— A. I think he had his head skinned where Mr. Turner threw him over his shoulder. I think it skinned his head some."

J. E. White, policeman, testified:

"A. We went in and looked around his place; and I was standing over there near the telephone and I heard him ask Bob (Turner) if he could use the telephone and Bob told him 'No' and Bob said 'You are under arrest' and give him them warrants; and he said 'that is just fine' and he said 'you sonsabitches, I want you to do all you can' and I walked over by the radiator and Bob started out to the car; and that is when I heard them scuffling and I looked around and Bob was leading him around out to the car; picking him up off the floor. Q. What happened? A. I didn't run over there but I think Casady helped get him in the car."

R. M. Ewing, policeman, testified that he was in the rear of the store building and heard a scuffle out on the sidewalk between the defendant and officer Turner. He further testified:

"Q. Did you see anybody hit anybody? A. I think, while scuffling, there was a lick or two passed. * * * Q. Who struck the first blow? A. I couldn't tell whether both struck, or what. The only thing I saw was just as they started out, and whether Mr. Montgomery in turning accidently hit him with his elbow or arm; but on Mr.

Turner's left side the glass kinder gouged in his mouth, and his glasses hanging by one ear, and Mr. Montgomery kinder turned—well, I don't know in turning whether he hit him with his fist or elbow. I am inclined to think his elbow. * * * Q. Was his back all skinned up? A. He was pretty well skinned up, but I think it was caused by falling on the sidewalk; and if anybody kicked the man, or used their boots on him, I didn't see it. I didn't see what took place prior to about six feet back. You know, where the counter goes down, five or six feet back in the store. I did not see what happened from there back in the store. * * * Q. Well, who hit those licks? A. There were some licks passed between him and Mr. Turner. Q. Who hit them? A. Mr. Turner, I think. I don't think there were over two or three passed. They were pretty close together. Q. And that is the way the old man got down, wasn't it? A. No, he didn't go down from those licks. He went to hollering."

Officer Turner testified that he had a search warrant and two warrants for the arrest of defendant when he and the officers went to his place of business. He further testified:

"Q. Did the defendant, Montgomery, say anything to you? A. I told him I had the warrants and he said 'That is fine. That is fine. That is just fine.' And 'You sonsabitches is making it better all the time.' And I took ahold of him and said that didn't make any difference and told him to go on out to the car and wait until they got through looking around and he hit me. * * * Q. What did you do? A. I grabbed him and carried him out of the place and we both fell. He got up and came at me again and I hit him and he came back again and I grabbed him and he went at me again and I threw him kind of over me as we fell. Q. Then what happened? A. We got him up and put him in the car and put him in the county jail. Mr. Casady and I."

This is all the testimony of the state.

W. H. Regian testified that he was the deputy court clerk and saw the defendant at the courthouse when he

was fixing to make bond. He further testified:

"Q. What was his condition, tell the jury? A. Well, he looked like a freight train had hit him. He was bloody and blood all over him. All over his shoulder and head. Q. Was his shirt torn off? A. It was torn. Not off of him. Q. His side bloody? A. Yes. Q. And body? A. No, I just saw where it was torn. Where his shirt was torn. Q. Did you notice whether or not he was stooped over like he was about to collapse? A. Yes, he was standing in a kinder stooped position. Q. He was in a very bad condition, wasn't he? A. Looked to me like he should have gone to the hospital."

L. M. Gregg testified that he was near the defendant's place of business and heard the defendant hollering for help and the officers were knocking him down and kicking him. That his head was bleeding on top and also his face was bleeding.

Ruth James testified that she lived near the defendant's place of business. That she heard the defendant hollering "My God, try to help me. Don't let them kill me." That she saw one officer grab him from behind and another officer grab his legs and throw him down and that is all that she could see from where she was.

E. L. Smith testified that he was passing the defendant's place of business and saw an argument taking place between three officers and the defendant. He testified:

"* * * I believe the 3 officers were standing just inside of the door 7 or 8 or 10 feet; and one of the officers had ahold of Mr. Montgomery's arm and he said: 'Let's go.' Told him, 'Let's go' and I believe—I didn't hear the exact words but I believe one word brought on another and the officer boosted Mr. Montgomery out the door and Mr. Montgomery said: 'What is this all about?' and if I seen correctly I believe I seen the officer hit him in the stomach five times and Mr. Montgomery fell and Mr. Montgomery's glasses fell off and broke; and

the officer fell and he hit his head against the car's bumper—two cars were setting there—and they lifted him and put him in the car and drove away and that is all I saw. Q. You don't work for Mr. Montgomery, do you? A. No, sir. Q. Or have any interest in his business? A. No, sir, I work for myself."

Dr. H. C. Bradley testified that he treated the defendant the night of August 26th. He further testified:

"Q. Tell the jury what his condition was? A. Well, the night I saw him I was called down to his place of business and I found Mr. Montgomery very nervous, I might say, shock, and he had skinned up his head—his head was skinned up—and his shoulder bruised and he was walking bent over and jittery and I took him out here in the country and put him to bed. Q. Was he injured in his abdomen? A. He said he was and walked like he was. Q. How long did you treat him? A. I put him to bed that night and had ice caps put to his head and told him to stay in bed the next day and, if he wanted me, to call me. Took him away out here to some place that night. Some house where he was living, and the day after—well, the intervening days—he came to my office and said that he was feeling better and he had a large skinned area on his head about the size of the palm of your hand and, as a matter of fact, he had bruises on his shoulder and his body and he complained of pain in his abdomen, and right side, and it was dark—what we call, cartilaginous hemorrhage. Subcutaneous tissues— Q. Indicating that it had been bruised? A. Yes, sir, and possible fracture of a rib; and I wanted him to have an X-ray made and he wanted to know if it would help it any and I said: 'No, but I would have the satisfaction of knowing whether it was broken or not'; and he went on back and got to feeling bad again and I put him in bed; and he started a temperature; and still complained of his right side and I strapped it for him good and proper; that is all I could do; and he had a cough and I believe I gave him some medicine and kept him in bed and he complained all the while of his side and lots of pain in his bowels and abdomen. Q. State whether or not

the temperature and symptoms indicated that the man had suffered a severe traumatic injury? A. That was it, yes, sir. The whole symptoms pointed to traumatism. Q. In other words, he had been severely beaten or injured? A. It was apparent in the whole thing."

Rufus Matthews testified that he saw one of the officers hit the defendant in the stomach with his left hand and defendant fell down and commenced to holler.

R. B. Thomas testified that he saw the defendant down on the sidewalk in front of his place of business and he saw one of the officers kick him. That he did not see Montgomery hit anybody.

Bill Evans testified that he was working in defendant's place of business. That when the officers came in defendant picked up the telephone to call his lawyer and that the officer jerked the phone out of his hand. That the officer pinned the defendant's arm behind his back and ordered him to "get in that car out there" and booted defendant out the door. That defendant fell and while he was on the ground he threw his arms around the officer's legs to keep from being kicked. That another officer ran up and kicked Montgomery and when the defendant got to his feet one of the officers hit him a couple of times in the chest and knocked him to the concrete and bumped his head on the sidewalk.

The defendant testified :

"* * * They jerked the telephone out of my hands and said to consider myself under arrest and I said, 'All right, what is the complaint?' and we stood there a few minutes and I wanted to call a fellow and tell the fellow working for me to call up the attorney at law, Mr. White, and I said; 'If they take me along,' I said, 'You call Mr. White' and 'They probably might cause me some trouble' and about that time I turned around and started and this Mr. Turner come up and said: 'You are under arrest,' and I said: 'I thank you,' and I walked on up and when

I did he grabbed my hands behind me and kicked me out on the street, and when he kicked me my legs went out from under me some way or another and I fell on the pavement and I seen they were trying to get me to hit him so I would be resisting an officer, but I wouldn't hit him, knowing what they were trying to do, and pretty soon I got up, started to get up, getting up, and when I did two or three of the laws ganged in around me and he was digging me with his fist and I was trying to keep anybody from hitting me any more and when I fell down again another law kicked me in the side and kinder kicked me down in behind a car I think the police had come in and took my head and bounced it up and down on the pavement and when I got up my entrails were all sticking out about a place as far as that and I was all over blood and they shoved me into the car and took me to jail. Q. Did they take you before any magistrate and give you an opportunity to make bond? A. No, sir. I tried to get bond and they wouldn't let nobody in. Q. What time of night did you make bond if you did? A. About 8 o'clock after dark."

In rebuttal some of the police officers were recalled and over the objection of the defendant were allowed to testify that they had found stolen merchandise in the defendant's place of business on several occasions.

The conviction of the defendant cannot be sustained. It is apparent throughout the record that the trial was an attempt at a justification on the part of the officers for their conduct in abusing the prisoner. The language used by this court in the recent case of Yates v. State, 73 Okla. Cr. 51, 117 P. 2d 811, 814, is applicable to this case. In that opinion it is stated:

"It would seem from the record that this prosecution against the defendant was instituted in an effort to try to justify the unlawful action taken by these officers.

"If we were to uphold a conviction in this case under the record, it would result in submitting all persons to

any indignity or assault that an arresting officer might see fit to heap upon him. People chosen to enforce the law should obey the law themselves."

The proof of the state in its strongest light was very weak so far as it tended to show that the defendant had unlawfully resisted arrest. Then when the evidence of disinterested bystanders is considered, it is clear that the judgment of conviction is erroneous.

The judgment of the court of common pleas of Oklahoma county is reversed and the defendant discharged.

BAREFOOT, P. J., and DOYLE, J., concur.